

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAFAEL DEJESUS,                          )
                                         )
                    Plaintiff,           )
                                         )    Case No. 09-cv-5005
          v.                             )
                                         )    Judge John W. Darrah
CONTOUR LANDSCAPING, INC.,               )
                                         )
                    Defendant.           )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff, Rafael DeJesus, brought this action against his former employer,

Contour Landscaping, Inc. ("Contour"), alleging that he received discriminatory

treatment after returning from a leave of absence. Plaintiff's Complaint sets forth five

causes of action: Count I is a claim for retaliatory discharge under the Illinois Workers'

Compensation Act, *codified at* 820 ILCS 305/1 *et seq.* Counts II and III assert claims of

ancestry discrimination under Title VII of the Civil Rights Act of 1964, *codified at*

42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, respectively. Count IV asserts a claim

of disability discrimination under the Americans with Disabilities Act of 1990, *codified*

*at* 42 U.S.C. § 12101 *et seq.* ("ADA"). Count V asserts a claim of retaliation under both

Title VII and the ADA. Contour moves for summary judgment on all counts. For the

reasons stated below, Contour's motion is granted in part and denied in part.

# BACKGROUND

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

Contour is an Illinois corporation engaged in commercial and residential landscaping, lawn maintenance, and snow removal. Def. 56.1(a)(3) ¶ 2. Seventy percent of its business is residential, and most of its work is performed in Skokie, Evanston, Glenview, Glencoe, Wilmette, Winnetka, and Chicago. Pl. 56.1(b) ¶ 89. The company was started in 1976 by Scott Schoeller, who still owns it today. Def. 56.1(a)(3) ¶¶ 3, 10.

In 2000, Schoeller hired Jeff Hufnagel to serve as his assistant manager with responsibility for lawn maintenance, snow removal, and landscape operations. *Id.* ¶ 10. During Plaintiff's time at Contour, Hufnagel served as Contour's general manager and directly oversaw all snow and landscape operations. *Id.* ¶¶ 4, 11.

Plaintiff, who is of Puerto Rican ancestry, was employed by Contour as a snow foreman in November 2005, was promoted to supervisor in April 2006, and remained in a

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

supervisory position until his employment with Contour ended in November 2008.[2] *Id.*
¶ 1.

When Plaintiff was hired as a snow foreman, he was a snowplow driver and did
not have supervisory responsibility over any other employees, though he eventually
managed a few other snow-removal employees from time to time. *Id.* ¶ 13. When
Plaintiff became a supervisor, he oversaw the garage and the equipment used by Contour
for landscaping and snow removal. *Id.* ¶ 14. At no time did Plaintiff have authority to
hire or fire other employees. *Id.* ¶ 14.[3]

As a supervisor, the next attainable level in Plaintiff's potential promotion path
was to management. Pl. 56.1(b) ¶ 73. Although Hufnagel did not actually want Plaintiff
to move into management, Pl. 56.1(b) ¶ 73, he met with Plaintiff in January 2007 to
discuss Plaintiff's expectations for increased salary, Def. 56.1(a)(3) ¶ 18. Hufnagel
drafted an attachment to Plaintiff's Supervisor Position Contract, which detailed the
licensing that Plaintiff should obtain to benefit Contour and further his own development

---

[2] Plaintiff disputes Contour's statement that he remained a supervisor until he left.
*See* Pl. Resp. to Def. 56.1(a) ¶ 1. He cites to the "Employment History" section of his
personnel file, which states that he held the position of "supervisor" in the "landscape"
department as of April 2, 2006; that he held the position of "supervisor/mgr." in the
"landscape" department as of May 26, 2006; and that he held the position of "supervisor"
in the "landscape/snow" department as of January 25, 2007. *See* Def. Ex. 7. Hufnagel
testified that Plaintiff was not a manager and that he does not know why he wrote
"supervisor/mgr." on his form. Pl. 56.1(b) ¶ 72. Plaintiff cites no other evidence to
support his contention that he was ever promoted from supervisor to manager.

[3] In connection with its reply brief, Contour filed a motion to strike portions of
Plaintiff's response to Contour's statement of material facts. On November 4, 2010, the
Court denied the motion but stated that it would consider the substance of Contour's
arguments in resolving Contour's motion for summary judgment. The "Background"
section of this Opinion contains only those relevant facts that are supported by the record
and properly asserted pursuant to Local Rule 56.1.

with the company. *Id.* ¶¶ 18, 19. For the most part, Plaintiff never obtained any of the licenses detailed in the attachment. *Id.* ¶ 20.

In March 2007, Plaintiff was asked to participate in interviewing Dick Armstrong, who was hired as a Landscape Manager. Pl. 56.1(b) ¶ 74. Armstrong is Caucasian and not disabled. *Id.* ¶ 74. He reports directly to Hufnagel. Def. 56.1(a)(3) ¶ 5.

In October 2007, Plaintiff injured his back in the course of his employment with Contour. *Id.* ¶ 21. Prior to his injury, Plaintiff routinely had to lift over 20 pounds; after he was put on restrictions due to the injury, he was never asked to lift over 20 pounds. *Id.* ¶ 22. In March 2008, Plaintiff went on leave from Contour as a result of his back injury. *Id.* ¶ 23.

When Plaintiff first went on leave, Contour's managers contacted him periodically to inquire about his progress. *Id.* ¶ 24. Sometime around April 2008, after Plaintiff retained an attorney for his workers'-compensation claim, Plaintiff's attorney directed Contour's managers to refrain from speaking to him. *Id.* From April 2008 until October 17, 2008, Contour received no information as to whether Plaintiff would return to work. *Id.*

In July 2008, while Plaintiff was on leave, Contour moved forward on creating a Snow Removal Manager position to take on the job duties Hufnagel had been handling. *Id.* ¶ 26. The new Snow Removal Manager would report to Hufnagel and be on par with the Lawn Maintenance Manager. *Id.* ¶ 28. The idea appealed to Hufnagel and Schoeller as a means to enable Contour to grow its already-lucrative snow-removal business, which Contour expected to become the largest sector of its operations. *Id.* ¶¶ 27, 30.

4

Contour was looking for someone with strong leadership skills, strong attention to detail, a business background, sales experience, management experience, and the ability to do proposals. *Id.* ¶ 29. Schoeller considered sales and customer contact to be the most important quality in managers, and the ability to speak English well was a component of good sales and customer contact. Pl. 56.1(b) ¶ 67. Hufnagel testified that Contour did not believe any of its current employees had the necessary skill sets for the new Snow Removal Manager position and that placing a current employee in that position would require an enormous amount of training or more advanced education than any of its current staff members had. Def. 56.1(a)(3) ¶ 33. Consequently, Contour did not consider promoting or training a current employee for the position. Pl. 56.1(b) ¶ 60.

Contour hired an independent recruiter to help fill the new position and worked with the recruiter to draft a job description, place ads, and begin interviews. Def. 56.1(a)(3) ¶¶ 26, 35. The recruiter obtained resumes from internet sites, such as Careerbuilder.com and monster.com, and posted an advertisement. *Id.* ¶ 35. The position was never posted at Contour.[4] Pl. 56.1(b) ¶ 59.

The description of the position provided, in part:

> We are searching for a Snow Division Manager who has leadership, customer service, systems skills and knowledge of the snow removal industry . . .

> The ideal candidate will have experience in managing snow removal crews, who expects the unexpected. Two years experience working for a larger company would be preferred but not required. Must have proven management, people and project skills, ability at setting up and implementing systems and customer service/need based selling skills.

---

[4] Contour's Employee Handbook provides, "In general, notices of all regular, full-time job openings are posted, although Contour Landscaping, Inc. reserves its discretionary right to not post a particular opening." *See* Docket No. 29-1, at 11.

You must have excellent communications along with basic computer skills.

*Id.* ¶ 64.

After posting the ad for the Snow Removal Manager, the recruiter screened the 120 resumes she gathered, selected five candidates based on their qualifications and personality, and presented them to Hufnagel. Def. 56.1(a)(3) ¶ 36; Pl. 56.1(b) ¶ 61. Although Hufnagel believed it would be a plus if a candidate was bilingual, the recruiter did not, to Hufnagel's knowledge, screen for bilingual candidates. Pl. 56.1(b) ¶ 65. A college degree was not required for the position. *Id.* ¶ 66.

John Sharapata was one of the candidates selected by the recruiter. Def. 56.1(a)(3) ¶ 36. Sharapata has a B.A. in business administration and over 15 years of management experience. *Id.* ¶¶ 6, 12. He did not have any snow-removal or landscaping experience, and he did not have any experience in managing snow-removal crews. Pl. 56.1(b) ¶ 80. The first time he drove a snowplow or salt truck was when he started working at Contour. *Id.* ¶ 83. Sharapata is neither Hispanic nor disabled, and he is not bilingual. Pl. 56.1(b) ¶ 78.

Hufnagel interviewed Sharapata. Def. 56.1(a)(3) ¶ 36. Although he initially was reluctant to hire him because of his lack of snow-removal experience, Hufnagel decided to look past it. Pl. 56.1(b) ¶ 81. He was impressed by Sharapata's experience and preparation. Def. 56.1(a)(3) ¶ 36. Schoeller believes that Sharapata was better qualified for the Snow Removal Manager position than Plaintiff because Sharapata had the ability to negotiate sales and because he had management experience and attention to detail. *Id.*

¶ 34. Sharapata was offered the position on September 25, 2008; he started work around October 8, 2008. *Id.* ¶ 37.

In contrast to the procedure Contour used to locate a Snow Removal Manager, Contour recruited laborers and foremen through word of mouth, ads in the Chicago Tribune and other newspapers that target the Hispanic population, and postings at vendors, which would reach "generally Hispanic" workers. *Id.* ¶ 62. Contour's written "Help Wanted Procedures" stated that help-wanted ads for crew and foremen should be placed "in Hoy, LaRaza, and Extra if you need to reach the Hispanic community." *Id.* ¶ 63. From 2005 to 2009, the only ads placed for foremen and laborers were in those three publications. *Id.* ¶ 63.

Although Schoeller believed Hispanics' work ethic was incredible for labor, he does not believe Contour has ever had a foreman or laborer he could trust to take accurate measurements for materials. *Id.* ¶¶ 86, 88. Schoeller presumed a lack of basic math skills as a result of problems he had encountered with log sheets on which employees had to record dates, times, locations, and amounts of materials used. *Id.* ¶ 88. Schoeller also did not believe he had any foremen or laborers with the customer-contact skills necessary to be a manager. *Id.* ¶ 88. From 2007 on, all of Contour's managers have been Caucasian. *Id.* ¶ 91. Plaintiff is the only Hispanic laborer or foreman ever to be promoted to a supervisory position at Contour. *Id.* ¶ 92.

Plaintiff, who is bilingual, was looking for advancement within Contour. *Id.* ¶¶ 68, 69. He was considered a trusted employee; he was the only Contour employee to be considered a supervisor, a position above foremen and laborers; and he received

higher raises than other employees because of his performance. *Id.* ¶¶ 68, 71. He did not have sales or procurement experience, however; and Schoeller and Hufnagel testified that he lacked the organizational and customer-service skills necessary for a management position. Def. 56.1(a)(3) ¶ 17. Additionally, Plaintiff never completed high school and does not have a GED or any other diploma. *Id.* ¶ 1. Hufnagel never considered Plaintiff for the Snow Removal Manager position because he did not believe he had the skill set sought by Contour. Pl. 56.1(b) ¶ 75.

Plaintiff was on leave during the entire hiring process and did not return until after Sharapata was hired. He was not released to work until October 17, 2008; and he did not speak with Hufnagel about returning until that date. Def. 56.1(a)(3) ¶ 38. At the time he was released to work, Plaintiff had a lifting restriction of 20 pounds. *Id.* ¶ 38. Although there were no permanent light-duty positions at Contour, Hufnagel told Plaintiff he would see if there was sufficient light-duty work to bring him back. *Id.* ¶ 39. Hufnagel told Plaintiff he was no longer a supervisor, no longer a full-time employee, subject to being seasonally laid off with the other laborers, and would no longer have paid vacation time. Pl. 56.1(b) ¶ 93. Hufnagel then consulted with Sharapata, who created a list of temporary jobs that met the lifting restriction. Def. 56.1(a)(3) ¶ 39. Plaintiff's workers'-compensation claim was not discussed. *Id.* ¶ 40.

Hufnagel and Plaintiff later agreed Plaintiff would return to work full time the week of November 3, 2008. *Id.* ¶ 41. By then, Contour had received information that Plaintiff would be released from all work restrictions on November 14, 2008. *Id.* ¶ 42. When Plaintiff returned, he was told he would report to Sharapata. *Id.* ¶ 43. Plaintiff

previously had reported to the Lawn Maintenance Manager. *Id.* ¶ 16. Plaintiff questioned whether Sharapata was replacing him and was told that the Snow Removal Manager's job was different from his. *Id.* ¶ 43. When Plaintiff questioned Hufnagel about not discussing the new manager position with him, Hufnagel stated that he was not required to explain himself to Plaintiff. Pl. 56.1(b) ¶ 94.

After he was hired, Sharapata needed to be trained on sales, price-breaks, writing contracts, proposals, creating estimates, preparing equipment, setting pricing, ordering snow-removal supplies, completing route sheets, keeping track of supplies, and manpower demands. *Id.* ¶ 84. He also had to be trained on the preparations necessary for snow removal, such as when and how to put plows and salt equipment on the trucks. *Id.* ¶ 85. Plaintiff already knew how to handle snow-removal preparations. *Id.* ¶ 85. Although Plaintiff was not told to train Sharapata, he did have to educate Sharapata as to the locations of materials and parts. Def. 56.1(a)(3) ¶ 47; Pl. 56.1(b) ¶ 94.

Sharapata provided Plaintiff with a list of jobs to do each day. Def. 56.1(a)(3) ¶ 44. Plaintiff's previous responsibilities required considerable amounts of heavy lifting; but because of his injury, he was not able to do that same work. *Id.* ¶ 45. Accordingly, he spent most of his first week back moving mulch and performing other light-duty work. *Id.* ¶ 46. Schoeller told Plaintiff he needed him to be "100% because there was no light duty." Pl. 56.1(b) ¶ 95. Schoeller also called the insurance company and said that he needed Plaintiff to be at full capacity because of the risk to Contour of his being injured again. *Id.* ¶ 98. Schoeller was disappointed that Plaintiff's claim increased Contour's

experience rating and cost thousands of dollars. *Id.* ¶ 98. At his deposition, he specifically stated as follows:

> [B]eing a professional person and concerned about the well-being of my business I could not afford a repeat surgery or workman's comp claim, I mean just common sense. You can't lose an employee again and then have another workman's comp claim, you know, because your rate goes up.

*Id.* ¶ 98.

Plaintiff was the only Contour employee who ever requested a physical accommodation and the only employee who had time off of work for a work-related injury paid for by workers' compensation. *Id.* ¶ 97. Schoeller believed there was a good possibility that Plaintiff would have a problem performing his job duties after his injury and thought it would be better for Plaintiff's well-being to find another job. *Id.* ¶ 98.

Hufnagel believed Plaintiff was becoming increasingly disgruntled at work, and he repeatedly explained Sharapata's role to Plaintiff. Def. 56.1(a)(3) ¶ 48. Sharapata was concerned that Plaintiff was not communicating with him about his daily completion of tasks and thought Plaintiff was reporting to Armstrong instead. *Id.* ¶ 49. Plaintiff thought Sharapata was not qualified for his job and told him as much (even though he had never seen Sharapata's resume and did not know his background). *Id.* ¶ 51.

On Monday, November 10, 2008, Plaintiff did not report to work. *Id.* ¶ 52. According to Plaintiff, he called in and told Hufnagel he was going to file charges against Contour. *Id.* Hufnagel denies having this conversation. *Id.*

When Plaintiff came to work on November 11, 2008, Sharapata spoke with him in Schoeller's office and told him things were not working out. *Id.* ¶ 53. Plaintiff told

Sharapata he was totally unqualified to do his job. *Id.* Sharapata became frustrated, and Plaintiff left his office. *Id.* ¶ 54. Sharapata then went to Hufnagel's office and told him about his conversation with Plaintiff. *Id.* ¶ 55. When Plaintiff returned, Hufnagel had a talk with him. *Id.* Plaintiff told Hufnagel that Sharapata was not qualified. *Id.* ¶ 56. According to Plaintiff, Hufnagel then said something to the effect of, "It's over," though Hufnagel never specifically told Plaintiff he was fired or terminated. *Id.* ¶¶ 56, 57. Plaintiff grabbed his jacket, left Hufnagel's office, and never returned. *Id.* ¶ 57. Hufnagel never called Plaintiff after he left and never expected him to show up at Contour again. *Id.*

At the time Plaintiff's employment with Contour ended, Schoeller, Hufnagel, Armstrong, and Sharapata were the only full-time, non-seasonal employees. *Id.* ¶ 15. Plaintiff's former job duties were shared among the managers. Pl. 56.1(b) ¶ 96. His snow duties were picked up by Sharapata exclusively. *Id.*

Contour has never provided any type of discrimination, harassment, or retaliation training. *Id.* ¶ 99. Its Employee Handbook contains a discrimination policy, but the handbook is not distributed; and managers are not required to read it, nor have they actually read it. *Id.*

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The five claims set forth in Plaintiff's Complaint arise from two incidents, each of which is reflected in a separate Equal Employment Opportunity Commission ("EEOC") charge filed with the Illinois Department of Human Rights. In the first charge, dated November 10, 2008, Plaintiff states that he was demoted on or about November 4, 2008, from a supervisory position to a laborer's position and replaced by another individual on

12

the basis of his ancestry (Puerto Rican) and a disability that did not affect his ability to perform the duties of his position. *See* Ex. A to Compl. In the second charge, dated November 12, 2008, Plaintiff states that he had informed Hufnagel he was going to file the first charge and that Hufnagel discharged him the following day (November 11, 2008), thereby raising an inference of retaliatory motivation. *See* Ex. B to Compl. For the most part, Plaintiff's Complaint follows his EEOC charges and also adds a claim for retaliatory discharge under Illinois law.

### Counts II and III

In Counts II and III, Plaintiff claims ancestry discrimination under Title VII and § 1981, respectively.[5] As Plaintiff notes, Title VII claims can be pursued under a disparate-treatment analysis or a disparate-impact analysis. *Regner v. City of Chicago*, 789 F.2d 534, 537 (7th Cir. 1986). While claims of disparate treatment require a plaintiff to prove that a defendant intentionally discriminated against him, claims of disparate impact involve facially neutral standards that nonetheless have a discriminatory effect in practice. *See id.*

Plaintiff argues that he can prove discrimination based on a theory of disparate impact resulting from Contour's use of separate hiring channels for management than it uses for laborers. According to Plaintiff, the impact of this policy is shown by evidence that Contour's management is entirely white, while almost all of its laborers are Hispanic. However, this argument appeared for the first time in response to Contour's motion for

---

[5] The requirements for proving discrimination are the same whether asserted under Title VII or § 1981. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) (*Egonmwan*).

summary judgment.[6] Plaintiff's causes of action are limited to those that are within the scope of his EEOC charge. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). Only those allegations that are "like or reasonably related to" allegations set forth in an EEOC charge are deemed to be within its scope, and a claim can only be maintained if it "reasonably could have developed from the EEOC's investigation of the charges before it." *Id.*

Plaintiff's first EEOC charge plainly alleges that Contour demoted and replaced him because he is Puerto Rican. There is no mention of any facially neutral policies that resulted in any discriminatory treatment. Similarly, Plaintiff's Complaint does not allege any such policies or make any mention of Contour's separate hiring channels. Accordingly, Plaintiff's belated disparate-impact theory will not be considered. *Cf. Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 526 (7th Cir. 2008) (holding plaintiff's claim that employer's policy was facially discriminatory was not properly alleged in EEOC charge); *Bennett v. Schmidt*, No. 96 C 6914, 2000 WL 1161073, at *5 (N.D. Ill. July 14, 2000) (granting summary judgment on disparate-impact claim because it fell outside scope of what was presented to the EEOC); *Leisen v. City of Shelbyville*, 968 F. Supp. 409, 422 (S.D. Ind. 1997) (same).

To succeed on his claim of ancestry discrimination, Plaintiff must therefore present sufficient evidence to convince a reasonable jury that Contour intentionally discriminated against him on the basis of his ancestry. To avoid summary judgment, he must offer direct proof of discriminatory motivation on the part of Contour or establish an

---

[6] Also, Plaintiff does not explain how Contour's posting of management positions on publicly available websites somehow excludes Hispanic applicants.

indirect case for discrimination under the formula set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (*McDonnell Douglas*). *See Egonmwan*, 602 F.3d at 849-50. Contour argues that Plaintiff has not identified any direct evidence of discrimination on the basis of ancestry, and Plaintiff does not refute that point. Therefore, argues Contour, Plaintiff must proceed under the *McDonnell Douglas* framework and prove the following: (1) that he is a member of a protected class; (2) that he was meeting Contour's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that another similarly situated individual outside his protected class was treated more favorably. *Id.* at 850.

If Plaintiff makes out a *prima facie* case by showing sufficient evidence as to the four elements stated above, the burden shifts to Contour to offer proof of a legitimate, nondiscriminatory reason for the adverse employment action taken. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). If Contour offers such a reason, the burden shifts back to Plaintiff to submit evidence that the proffered reason is mere pretext for true discriminatory motives. *Id.*

For purposes of this motion, Contour concedes that Plaintiff is a member of a protected class by virtue of his Puerto Rican ancestry and that he was meeting Contour's legitimate expectations prior to the claimed adverse employment action. Contour also concedes that being replaced by a less-qualified, non-Hispanic person would be a material, adverse employment action. It argues, however, that "Plaintiff cannot show that Contour took any action against him based on a protected characteristic." Mem. in Support of Def. Mot. for Summ. J. 4.

15

This argument is somewhat confusing in that it conflates the separate components of the *McDonnell Douglas* framework. The specific reasons provided in Contour's *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* as to why Plaintiff cannot show that Contour took any action against him based on his ancestry are as follows: (1) the circumstances surrounding Plaintiff's termination are wholly unrelated to his ancestry; (2) Plaintiff cannot identify a comparator who was treated more favorably than he; (3) Plaintiff's supervisor position was not the same as the Snow Removal Manager position; and (4) Plaintiff was not qualified for the new position.

As to Contour's first argument, Plaintiff does not actually allege that he was terminated on account of his ancestry. In Count II, Plaintiff claims he "was replaced by a non-Puerto Rican employee with less experience" and "outright denied the opportunity to achieve and advance despite his effort." Compl. ¶¶ 27-28. Moreover, Plaintiff specifically alleges that he filed his first EEOC charge (for discrimination) on November 10, 2008, returned to work the next day, and was terminated in an act of retaliation for going to the EEOC. The first charge makes no mention of termination, and the second charge makes no mention of ancestry discrimination. Therefore, Plaintiff cannot now argue that he was terminated on account of his ancestry.

Contour's second argument – that Plaintiff cannot identify a similarly situated employee who was not subject to the same adverse treatment – and its third argument – that Plaintiff's supervisor position is not the same as Sharapata's Snow Removal Manager position – present an obvious challenge to the fourth element of Plaintiff's

*prima facie* case under *McDonnell Douglas*. The only proposed comparator in this case is Sharapata, and Contour argues that Sharapata is not similarly situated.

Although a plaintiff is not required to identify "a doppelganger who differs only by having remained in the employer's good graces," the plaintiff must identify a comparator who is "similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable" – in this case, ancestry. *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008).

To the extent Plaintiff persists in claiming he was demoted on account of his ancestry, Sharapata is not a valid comparator. Sharapata began working at Contour on October 8, 2008; Plaintiff was on leave at that time and did not return until the week of November 3. His last day was November 11, 2008. The two men worked together for approximately one week, at most. The parties dispute whether Sharapata's position and duties were essentially the same as those previously held by Plaintiff, but it is undisputed that Plaintiff did not assume his previous position and duties when he returned from leave. Thus, it is also undisputed that the two men did not hold the same position at the same time; and it is impossible to characterize them as similarly situated.

Plaintiff avoids the issue by repackaging his demotion claim as a claim for failure to promote. Contour argues that this, too, is beyond the scope of Plaintiff's EEOC charges. Unlike Plaintiff's belated disparate-impact claim, however, a failure-to-promote claim is reasonably related to the averments in Plaintiff's first EEOC charge. The gravamen of Plaintiff's discrimination claim is that Contour hired Sharapata to replace

17

him and demoted Plaintiff to a laborer's position when Plaintiff returned from his medical leave. Whether Sharapata assumed Plaintiff's old position or was hired into a new position for which Plaintiff believed he was equally qualified, it is undisputed that Plaintiff returned to find Sharapata in a position that was superior to Plaintiff's current position. Therefore, a claim that Contour discriminated against Plaintiff by not promoting him to the newly created position is within the scope of his allegations that Sharapata replaced him.[7]

When a plaintiff alleges he was passed over for a promotion, the elements of his *prima facie* case differ slightly from those set out in the parties' briefs. A plaintiff must show: (1) that he is a member of a protected class; (2) that he is qualified for the position at issue; (3) that he was rejected for that position; and (4) that the position was awarded to someone outside the protected class who is similarly or less qualified. *Hobbs v. City of Chi.*, 573 F.3d 454, 460 (7th Cir. 2009).

Because Contour never considered Plaintiff for the position or gave him an opportunity to apply for it, Contour argues it is impossible for Plaintiff to show he was rejected. That argument is unpersuasive. Passing an employee over for promotion can be a form of rejection that would support a claim for discrimination. *See id.* A plaintiff need only show he would have accepted the position if offered to him. *See Fischer v. Avanade*, 519 F.3d 393, 402 n.2 (7th Cir. 2008) (*Fischer*). Plaintiff's supervisor contract (with its stated promotion path to management) and his obvious disappointment with the

_____

[7]Contour actually acknowledges this in its opening brief, stating, "Plaintiff now contends that he should have been given the position of Snow Removal Manager and that Contour's failure to give him that promotion is evidence of ancestry and disability discrimination." Mem. in Support of Def. Mot. for Summ. J. 5.

decision to hire Sharapata constitute sufficient evidence to avoid summary judgment on this element.

The relevant question is whether Plaintiff can show that his qualifications for Contour's Snow Removal Manager position were at least equal to those of Sharapata, and it is here that a legitimate question of fact remains. There is no question that Sharapata and Plaintiff have different qualifications. Sharapata has a degree in business administration and management and sales experience, while Plaintiff never graduated high school and lacks any sales experience or significant management experience. On the other hand, Plaintiff is bilingual and has experience in the snow-removal industry, while Sharapata is not bilingual and had absolutely no snow-removal experience prior to being hired by Contour. Thus, both individuals had some – but not all – of the preferred qualifications stated in Contour's advertisement for the position.

Although Contour has presented Hufnagel's and Schoeller's testimony as to what each of them considered important for the position, Contour has not presented any evidence to show what Sharapata does in the course of his employment and no evidence to show that Plaintiff would be less qualified to perform those duties. When Plaintiff's employment with Contour ended, all of his responsibilities were assumed by Contour's managers; his snow-removal duties were assumed by Sharapata exclusively. Although, Contour argues that Sharapata had significant duties beyond those previously undertaken by Plaintiff, Contour has offered no evidence on this point. Thus, a genuine issue of material fact exists as to whether Plaintiff (a Hispanic) was equally qualified for the

Snow Removal Manager position as was Sharapata (a non-Hispanic) such that Plaintiff arguably has established a *prima facie* case of discrimination under *McDonnell Douglas.*

The presence of a factual dispute regarding Plaintiff's qualifications, however, is not enough to show that Contour's reasons for not promoting Plaintiff are a pretext for discriminatory motives. Contour asserts that it created the Snow Removal Manager position to assume *Hufnagel's* (not Plaintiff's) responsibilities for Contour's growing snow-removal business and that it wanted to hire someone with management and sales experience. Sharapata had the aforementioned management and sales experience as well as a degree in business administration. Contour did not believe Plaintiff (or any of its current employees) were qualified for the position. Furthermore, it is undisputed that Plaintiff was out on disability at the time Sharapata was hired with no indication as to when he would return, if ever. These reasons for selecting Sharapata, if true, are legitimate and nondiscriminatory. Therefore, Plaintiff can only avoid summary judgment if he can set forth sufficient evidence for a reasonable jury to find that the reasons Contour provided are not the real reasons for its actions – that they are mere pretext for its true motive of denying Plaintiff the opportunity because he is Puerto Rican. Plaintiff has not done so.

"Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (*Sublett*) (quoting *Russell v. Acme-Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). To demonstrate pretext, a plaintiff must show: (1) that the employer's "nondiscriminatory reason was dishonest" and (2) that the employer's "true reason was based on a discriminatory intent." *Fischer*, 519

F.3d at 403 (internal quotation marks and citation omitted). A plaintiff may prove pretext with direct evidence, or indirectly by showing "that the employer's reason is not credible or that the reason is factually baseless." *Perez v. Illinois*, 488 F.3d 773, 777-78 (7th Cir. 2007) (citations omitted). "[The plaintiff] must also provide evidence of at least an inference that the real reason for [the adverse employment action] was discriminatory." *Id.* (internal quotation marks and citations omitted).

The fact that Plaintiff was bilingual and had snow-removal experience is not evidence that Contour's reasons for hiring a person without those qualifications was pretext for discrimination. Evidence that the person who received the promotion was less qualified than the plaintiff may be indicative of pretext, but the difference in qualifications must be significant. *Sublett*, 463 F.3d at 738. Those differences must be "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Id.* (internal quotation marks and citation omitted). Indeed, a gap in credentials between the plaintiff and the person who received the promotion must be so substantial as to "slap you in the face." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 562 (7th Cir. 2004) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 (7th Cir. 2002)). Even if a plaintiff can show that his employer made the wrong decision as to who was more qualified, he would still have to show that the employer's stated reasons for hiring that person were lies, offered to cover discriminatory motives. *See id.*

Here, any superior credentials Plaintiff might possess are not so significant as to leave "no dispute among reasonable persons of impartial judgment." Although the job

description for Snow Removal Manager provided that the *ideal* candidate would have experience managing snow-removal crews, it stated that the candidate *must* have proven management, customer-service, and selling skills. Additionally, Plaintiff has not identified any evidence to support an inference that Contour lied about believing Plaintiff was not qualified to be Snow Removal Manager. There is absolutely no evidence that Hufnagel, Schoeller, or anyone else at Contour ever made any derogatory comments about Hispanic workers or otherwise treated Hispanic workers in a discriminatory fashion. Indeed, the only racially charged statement Plaintiff has identified from any Contour employee is Schoeller's statement regarding his perception that Hispanic workers have a good work ethic. Moreover, Plaintiff's purported statistical evidence (showing that none of Contour's few managers are Hispanic and that most laborers have been Hispanic) is underdeveloped and unconvincing.

Ultimately, Plaintiff's claim is only supported by his subjective belief that he was equally (or better) qualified for Sharapata's position. Plaintiff does not identify the responsibilities of that position and does not rebut evidence that Contour wanted to fill the position with someone who had certain qualifications that Plaintiff did not have. Plaintiff's subjective belief in his own abilities is insufficient to show pretext. *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008). Accordingly, Contour is entitled to judgment on Counts II and III.

### Count IV

In Count IV, Plaintiff claims Contour violated the ADA. Once a plaintiff has established that he is a qualified individual, under the ADA, he may show discrimination

in either of two ways: "by presenting evidence of disparate treatment or by showing a failure to accommodate." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (*Hoffman*) (citation omitted). For purposes of this motion, Contour concedes that Plaintiff was a qualified individual.

The *McDonnell Douglas* approach used in Title VII cases can also be used to prove a disparate-treatment claim under the ADA. *Id.* Similar to the reasons stated above, Plaintiff cannot show that Contour's reasons for not promoting him to the Snow Removal Manager position were pretext for discriminating against him on the basis of his disability. Plaintiff has produced no evidence to rebut Hufnagel's and Schoeller's statements that Plaintiff was not considered for the position because he was out on leave and lacked the skills Contour sought in a manager. Nor has Plaintiff identified any evidence that anyone at Contour had any discriminatory animus toward persons with disabilities. Therefore, to the extent Plaintiff claims he was demoted or passed over for promotion on the basis of his disability, that claim fails.

However, Plaintiff also claims he was *terminated* on the basis of his disability.[8] As an initial matter, there is some question as to whether Plaintiff was, in fact, terminated. Contour maintains that Plaintiff quit. Plaintiff says he left only after being told, "It's over," which he interpreted to mean he was fired. Plaintiff also argues that

---

[8] As explained above, a claim of discriminatory termination is arguably outside the scope of Plaintiff's EEOC charges. Unlike with his Title VII claim, however, Plaintiff specifically alleges in his Complaint that he was terminated on the basis of his disability; and Contour did not argue that Plaintiff's claim of termination under the ADA exceeded the scope of his EEOC charges.

being passed over for promotion signaled that his job was at a dead end, such that a resignation would effectively qualify as a constructive discharge.

To prevail on a claim for constructive discharge under the ADA, a plaintiff must show the presence of a hostile work environment that became "so intolerable that her resignation qualified as a fitting response." *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 978 (7th Cir. 2009) (citation and internal quotation marks omitted). In this case, a claim for constructive discharge is not supported by the allegations in Plaintiff's EEOC charges or his Complaint, both of which expressly state that he was terminated. Thus, Plaintiff cannot proceed on a theory that he was constructively discharged. However, the question of whether Plaintiff resigned or was terminated must be left to the jury.

Assuming Plaintiff was fired, Plaintiff argues that he has presented enough direct evidence to allow a jury to determine that he was terminated on the basis of his disability. Before Plaintiff's employment ended, Schoeller told him that he had to be at "100% because there was no light duty." Schoeller also admitted that he thought Plaintiff's injury might make it difficult for Plaintiff to perform his job duties and that he might be better off finding another job. At this stage, all reasonable inferences must be drawn in Plaintiff's favor. Because Contour has conceded that Plaintiff is a qualifying individual with a disability who was capable of performing his job, Schoeller's statements could allow a reasonable jury to find that Contour terminated Plaintiff out of fear that his disability would prove to be a liability, rather than allow him to resume full-time work.

Plaintiff also argues that Contour failed to accommodate his disability.[9] The approach under *McDonnell Douglas* is neither necessary nor appropriate for such claims. *Hoffman*, 256 F.3d at 572. Instead, a plaintiff must prove that his employer was aware of his disability and still failed to reasonably accommodate it. *Id.* (citation omitted).

Contour admits that it was aware of Plaintiff's disability but argues that it reasonably accommodated Plaintiff's needs. The burden on this point is Contour's: once an employer is aware of an employee's disability, the employer must engage in a flexible, interactive process to determine appropriate reasonable accommodations under the circumstances. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). Although Contour has shown that it accommodated Plaintiff by providing him with some light-duty work upon his return, there is also evidence to suggest that Plaintiff was downgraded from his previous position and that he needed to be "100% because there was no light duty." Contour has offered little evidence as to what, if any, interactive process was undertaken, how Plaintiff's previous position was affected by his lifting limitations, and what specific accommodations were made. Ultimately, Contour has not shown that its accommodations were reasonable as a matter of law.

Accordingly, although Plaintiff may not proceed on a disparate-treatment claim that he was demoted or passed over, he may proceed on a disparate-treatment claim for

---

[9] Contour argues that a failure-to-accommodate claim is beyond the scope of Plaintiff's EEOC charges. However, unlike Contour's argument that Plaintiff's disparate-impact claim exceeded the scope of his EEOC charge, this argument did not appear until Contour's reply brief. And unlike Plaintiff's Title VII, discriminatory-termination claim, Plaintiff did allege a failure to accommodate in his Complaint. *See* Compl. ¶¶ 33-34. Moreover, Contour expressly challenged the merits of Plaintiff's failure-to-accommodate claim in its opening brief. The beyond-the-scope argument in Contour's reply comes too late.

termination and a claim for failure to accommodate. Contour's motion for summary judgment as to Count IV is denied.

*Count V*

In Count V, Plaintiff alleges he was terminated in an act of retaliation the day after he informed Hufnagel that he was going to file an EEOC charge. A plaintiff can establish unlawful retaliation by using either the direct or indirect method of proof. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). In this case, Contour confines its argument to the direct method, which requires the plaintiff to prove the following: (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) a causal connection between the two events. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008).

Contour offers three arguments against Plaintiff's retaliation claim. First, Contour notes that Hufnagel denies that Plaintiff ever told him he was going to file a charge. This denial conflicts with Plaintiff's version of events and presents a genuine issue of material fact for the jury. Contour's second argument is that Contour never fired Plaintiff. As discussed above, whether Plaintiff quit or was fired is another question of fact that cannot be decided on a motion for summary judgment.

Contour's final argument is that Plaintiff has shown nothing more than "temporal proximity" between the filing of his EEOC charge and his alleged termination. Contour contends that Plaintiff's refusal to follow his manager's instructions was the only topic of conversation on the day Plaintiff allegedly was fired and that, if he was fired, it was because of insubordination. Although suspicious timing is rarely enough to create a

question of fact for the jury, in cases "where the adverse impact comes on the heels of the protected activity, it is." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (citations and internal quotation marks omitted).

Thus, factual issues remain as to whether Plaintiff was terminated as a result of filing an EEOC charge; and Contour's motion for summary judgment is denied as to Count V.

### Count I

In Count I, Plaintiff claims he was fired in retaliation for filing a workers'-compensation claim.

To establish a claim for retaliatory discharge under Illinois law, a plaintiff must prove the following three elements: (1) that he was an employee of the defendant prior to the injury; (2) that he exercised a right under the Illinois Workers' Compensation Act; and (3) that his discharge was causally related to the exercise of that right. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994) (*Jackson*) (citations omitted). The *McDonnell Douglas* framework is not applied to such claims under Illinois law. *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010). Instead, a plaintiff must present sufficient proof of causation to warrant presenting his claim to a jury. *Id.* That is, Plaintiff must identify a genuine issue of fact regarding whether Contour terminated him *because* he filed a claim for benefits under the Workers' Compensation Act. "Illinois allows employers to act on the basis of their employees' physical disabilities; it is only the request for benefits that state law puts off limits as a ground of decision." *McEwan v. Delta Airlines, Inc.*, 919 F.2d 58, 60 (7th Cir. 1990).

Here, it is undisputed that Plaintiff received workers'-compensation benefits and remained on medical leave as a result of his injury for several months. After months without contact, Plaintiff informed Hufnagel he wanted to work again. Hufnagel informed Plaintiff that his former position was no longer available and accommodated Plaintiff by finding light-duty work that Plaintiff could perform with his lifting restrictions. Plaintiff was unsatisfied with this arrangement and filed a charge of discrimination. The following day, he got into an argument with Hufnagel; and, one way or another, his employment ended. There is no evidence to suggest that Plaintiff's workers'-compensation claim was discussed.

However, Plaintiff is the only Contour employee who ever took time off of work for a work-related injury paid for by workers' compensation. This, combined with Schoeller's statement that Plaintiff needed to be "100%" and his expressed concern that Plaintiff would injure himself and file another claim, is sufficient to warrant submission of this claim to the jury. Contour's motion is denied as to Count I.

## CONCLUSION

For the reasons stated above, Contour's Motion for Summary Judgment is granted as to Counts II and III and denied as to Counts I, IV, and V.

Date: Aug. 11, 2011

JOHN W. DARRAH
United States District Court Judge

28